Mr. Arnold, whenever you're ready, we'll be glad to hear from you. Thank you. May it please the Court. I'm Andy Arnold. I represent the appellant Tom Davis in this appeal of the jury verdict in a South Carolina wage payment case. The jury in this case awarded $14,526. We are appealing the damage calculation of the jury, which was against a clear weight of the evidence and based on false evidence, if you will. And this is the first basis in the first issue of our appeal. We're also appealing two other issues. One is the judge's failure to instruct the jury to construe the July 26, 2005, offer letter, which is in the appendix at page 442. The failure to instruct the jury to construe that offer letter against the drafter, who was MPW, the defendant in this case, against the drafter to conform and to properly instruct the jury that was abuse of discretion. And then the third issue is that the Court failed to award treble damages and attorney's fees. So you want a new trial? I want a new trial. Based on damages, you want a whole new trial. That's right. That's right. And on the failure to give the jury instruction. Now, I think it would be helpful to call the Court's attention to what is the central piece of evidence in this case. And that is Exhibit 11, and it is on page 442 of the joint appendix. My client, Tom Davis, had worked for MPW for a number of years. And MPW provides cleaning services, janitorial cleaning services, clean paint booths, clean the ovens at BMW, and they have a presence at the plant full time, 30, 40 employees at the time my client was given the account manager position. And he was offered the account manager position on July 26, 2005. Now, prior to that time, he was asked if he was interested, and he indicated that he was interested. And he was told that he's going to pay this much, and it's going to include these terms of compensation. And so on July 26, 2005, Dave Barrows, who is the direct report for the account manager, came to BMW and gave my client an offer letter, which is, again, joint Exhibit 11 at page 442. And my client looked at the offer letter and noticed that there were three items that had been previously discussed with him that were not in the offer letter. He had been promised a truck and a fuel card. There was a 15% bonus that was based on turnover OSHA goals, and you can see it is outlined in the contract. It's referencing the BMW contract between MPW and BMW. And finally, and this is the issue in this case, is he was told that there would be a 1% bonus paid on all gross revenues billed in excess of the contract amount. So, to help clarify this, if you'll look at. He was told that. That's not written anywhere, right? No, that's right. So when he says, hey, you've left out the new work bonus, Dave Barrows picked up the phone and called Paul Bouchard, who was the general manager, and said, in my client's presence, Tom says there's some things left out of this letter. He said the fuel card. And then Mr. Barrows proceeds to write truck and fuel card on this letter. He says we left out the 15% bonus. He then handwrites that, and he says we left out the 1% new work bonus for the increase of the contract to BMW. And then he handwrites that, and then he signs it. And the parties entered a stipulation that the signature on this document below the handwritten notes was Dave Barrows. And it is dated. He then hands it to my client, who says, give me a day to think about it. He goes home, thinks about it, comes back, signs the letter, hands it, and he becomes the account manager. Nobody really expected the level of growth of this account. And if you'll just look at joint appendix page 391, which is the BMW contract itself, the amount of the BMW contract with MPW is $1.975 million. That's the baseline contract. And it is billed monthly in equal installments of $164,000. And that was the contract. Now, the parties could agree to do more or less, but the baseline amount of that contract was $1.9 million. And so the offer letter that references increase of contract at BMW was referring to that brand new contract that MPW had just entered into with BMW for $1.9 million a year. And that was a three-year contract. Let me go back. Yes, sir. I'm looking at Exhibit 11. Now, where do you say it's signed? If you'll look. I see where Mr. Davis signed it. Davis signed it, but where is it signed by anybody representing MPW? If you'll look right at the very bottom, right above 720. What page are you on? I'm sorry, 442. It is. That's where I am. Okay. If you'll see 726.05. Right. Right above that, right under contract, there's a scribble. Not on what I'm looking at. Oh, yeah. Well, okay. You're saying that's a signature. Yes. And there was a stipulation. I see what you're talking about now. That's right. And there's a stipulation entered on page 57 of the joint appendix where the parties agree that that is the signature of Dave Barrows. So it was signed. And if you also look at this letter. And this letter is the written agreement? Yes. And you maintain these terms are definite and certain to yield a particular damage? Well, this is what I contend. I contend that these are the terms and conditions of his employment. I contend that the new work bonus, although it required some parole evidence to describe exactly what it was referencing, but that this is the offer letter that was. Because this is ambiguous. It is ambiguous. Well, at least that was the argument made by the defendant. What is ambiguous? Is ambiguous what he was told or is it what is set forth here? Well, I think it's what's set forth here. Wasn't he also told something? You said that? That's right. He was told beforehand, hey, these are the things you get. But even in the process of doing something here, you said he was told something about the 1% and all that. Well, that's right. He was told there's a 1% new work bonus. And so when he said, hey, what about the 1% new work bonus? They said, you're right. And they added that to the offer letter. Now, the offer letter by its terms. It was part of his contract agreement that's supposed to be oral. Perhaps. And I say that because I think there's different ways to view the offer letter. You could view the new work bonus for increase of contract to BMW as a shorthand reference to the 1% bonus, or you could say that the 1% number was supplied orally. Nobody disputes that the multiplier was 1%. That's not in dispute that there was a 1% multiplier. The question is, multiplied against what? Our contention, it was multiplied against the increase against the baseline of the contract. Now, we didn't make that up. The general manager testified to that very fact. He testified that, and I can read this, that. This is DeFazio? This is Paul Bouchard, who was the general manager, who was the one with the authority who authorized the making of this offer. And what Paul Bouchard said was it was a very simple idea. And he said, we kept it very simple. It was based on, like I mentioned earlier, the budget revenue amount, the baseline. In this case, it would have been July 1, 2005, any incremental increase, regardless of the nature. If that's what you're asking, it was built-in book revenue increase on the baseline. So if we accept, granted, there was evidence here to support the basis of your contention, the jury chose to go with the $14,240 figure, and there was testimony, I believe, at trial where DeFazio presented a calculation that was introduced to show essentially there was no meeting of the minds, not as to this alternative calculation of damages. You didn't object. No, I didn't object because there was no – they were offering this alternative explanation to show that there was no meeting of the minds. And there was a limiting instruction to that effect? No, but – Did you ask for such? I did not. But you still, for example, the BMW – I don't want to over-talk you, but I want to make sure I understand that point because I think that's critical, and I don't want you to leave it because you leave that point, you may leave something that's the critical part of your argument. Okay. So I know there are other things we'll talk about, but you've got this evidence that's being – this calculation that's given to the jury that yields this damage figure here, for which you say is for another purpose other than to show damages, but it is presented in a manner as though it is an alternate way of calculating the damages, and you get these two different figures. The jury chose this figure. You didn't object to it when it was presented, nor did you ask for a limitation of instruction, nor was there any clarification to the jury in its presentation that this was not to be – obviously not because the jury would have ignored that. So there's no clarification. How does the jury know that? Well, good question, and certainly they may have been confused, and I don't say that I'm completely blameless in the fact that maybe there were things that could have been done that weren't done, but it still doesn't change the fact that the 14,526 number came – that number was based on a calculation of a project booking bonus. It was a policy that was never implemented. But you have a jury in front of you. I understand. And what the jury has put – we ask juries to do very difficult things. You are the lawyers. You know what's going on here. That's right. And he takes the stand. And he gives this alternate basis, one of which he reaches. One figure and the other reaches exactly this figure, $14,000. And that's what it appears when you read here. He's given an alternate calculation. You didn't object, nor did you ask for any type of limiting instructions. Your Honor, like you instructed the jury, that that $14,000 was only for the limited purpose of da-da-da. And then you send it back to the jury, and when they come back and say, I took 14, you say, foul. That wasn't what that was in there for. But no one ever told them. So what do we do? Well, I think they were told by the evidence. I mean, I understand that perhaps there were some things that I could have done that made it clear. Look, I learn something every time I try a case. I think it's a little bit more than making it clear, because it is clear. What you need to do is to make it known, though it's clear, that's not the purpose of this. You're not challenging the fact that this figure is here. What you're saying, it shouldn't be the ultimate damage figure. But both sides, just again in fairness, both sides argued to the jury that, hey, nobody's contending this is the number. Because, in fact, this is, I think. You gave it to them. But I think this is. An argument does not trump evidence. But the evidence was shown not that this was the damage calculation. This is critical. This project booking bonus was a document they were saying was under discussion, and that that under discussion would only have produced a bonus of $14,000. So there was no way they would have promised my guy $111 when this booking bonus under discussion would have only entitled him to $14,000. But this is the most critical point, because I don't have much time. But you're saying the other side stood up and said, we're not saying this figure is $14,000. Yes. And now they're going to come up and tell us now, we say it is $14,000. Yes, yes. That's going to happen when the other side gets up here. They're going to say, we told the jury it wasn't $14,000 because that wasn't the purpose of it. But now you're honest, that was the purpose of it was the $14,000. Right. And they even told the court that we weren't. That's going to happen today. Well, I don't know. But I can certainly tell you that was the point made to the trial judge when I said, hey, they're arguing the policy. He said only to show a fair to meet of the minds. And that resulted in a stipulation on the jury charge. But the one point, I'm out of time. But the point I have to make, Your Honor, Your Honors, is that the calculation that was performed that resulted in the $14,526 number was from a policy that did not exist at the time that the July 26 offer letter was made. There cannot have been a meeting of the minds that that was the way of calculation because it didn't exist. What's in the record, and I will just refer to it and then hush, the joint exhibit 31 is at page 456. And then in the joint appendix, the supplement joint appendix, is where the project booking bonus is found. The only one in the record, and the one Mr. Defazio used to come up with that calculation, is dated November 2005. That policy wasn't even there. Your Honor, you're out of time. I'm sorry. If you want to take it out of your reply, it's fine. I'll do it. Thank you very much. Mr. Kilgore. May it please the court. My name is Philip Kilgore. I'm with the Ogletree Deacons Law Firm in Greenville, South Carolina, and I'm here representing NPW, the appellee in this case. You know the question I want to ask you initially. Why don't you go ahead and deal with that one? I'm going to deal with it right up front, Your Honor. I find myself in the peculiar position of defending a plaintiff's verdict, but I'm going to do that. We tried the case. We did the best job we could. We defended it. We put up a plethora of evidence that there was an absence of a meeting of the minds. We did the best we could to try to explain to the jury what the various understandings were, what the various understandings of the terms were, and what the consequences of the terms were in terms of what the damage amounts would be. And as Your Honor pointed out, it was admitted without objection, without any request or limiting instruction. Of course, we would have vigorously opposed that had the request been made, but the jury did what the judge asked the jury to do. I mean, if we look at the charge that was given to the jury, Judge Childs said in doing this you must decide which testimony to believe and which testimony not to believe. You may disbelieve all or any part of the testimony of a witness's testimony. Did you argue to the jury that the 14,000-some-odd figure is not there for purposes of damages, but it is for a very limited purpose? Well, of course, we made the point to the jury that we are not at all conceding that there was a contract. But as pointed out in the U.S. v. Smoot case, the fact that a jury's verdict is not consistent with either party's theory of the case is not a ground for a retrial. And Smoot goes on to say that the jury heard the evidence, in this case, in that case, the expert testimony. The jury heard the evidence presented by the parties and could accept or reject any part of their testimony. And I think that's the essence of a jury trial is that the jury has to take the facts that are presented and make the best possible choice that they can make. The verdict form, which is in the record, has three points that I think are relevant here. One is, was there a contract? The answer that they gave was yes. Was the contract breached? The answer to that was yes. The third point on the verdict form is, what is the amount of damages? And the jury heard the evidence. The jury chose not, with all due respect to the appellant, the jury chose not to accept the appellant's version of what constituted the facts. Was the contract written or oral? Well, Your Honor, we served a discovery request asking for a document, any documents that constitute a written agreement. And the response was there is no, in essence, there is no written agreement. And I'm going to try to quote as best I can, but it was, there was an oral contract memorialized by an offer letter. Now, if counsel is willing to stipulate here today that that offer letter was a written agreement, then that would make short order of this case because the offer letter in this case couldn't possibly constitute a written agreement. Every written agreement has to contain all the material terms. One of the most important terms in a written agreement is the term, the price term, which either needs to be a fixed amount or some reasonable means of ascertaining it. If you pick up this offer letter, there's no way you could ascertain what the bonus was. And now, that's not a failing of ambiguity. That's a failing of completeness. You can go back to the joint appendix back there with the 1.9 figure on 391 and sort of calculated that knowing that it was 1% of coming up with a figure. But that would call for evidence outside, and it would call for an interpretation of oral testimony by Mr. Bouchard that that's what he meant. But that's not, if you look carefully at the testimony of Mr. Bouchard, he did not say that the baseline in this so-called contract was some random figure out of the BMW contract. What he testified repeatedly over and over again, and we cited to it in our brief, is that the baseline was the annual budgets. And how else would you measure performance? Would you measure performance three years into the contract based on some random figure, or do you examine the state of the business? At a given point in time, you develop the annual budgets, and you measure performance based on the budgets. That's what Mr. Bouchard testified to. The other thing Mr. Bouchard testified to, which is the reason why the policy is relevant, again, if you look throughout his testimony, he makes numerous references to this policy that he developed. He took the sales commission policy. He changed a few things around. He testified that this, in essence, that this policy served as the basis for the agreement that he reached with Mr. Davis. All Mr. DeFazio did was take Mr. Bouchard's testimony and the plain language of the policy that the draft policy that he was developing that had to have been on his mind when he said he entered into this agreement with Mr. Davis. Why was this not bifurcated? I beg your pardon? Why was it not a bifurcated trial to try damages separately? Well, Your Honor, to be perfectly honest with you, we really struggled with trying to pin down what was the agreement. We thought if we got a concession that he thought the offer letter was the written agreement, we were looking at summary judgment. But instead he said it's an oral agreement memorialized by this offer letter. So given the shifting sands, we decided our best way of approaching the litigation in this case is to just hit it real hard with a meeting of the minds case. So we developed witness testimony and took the testimony that we had available to try to demonstrate to the jury that there were all these alternative understandings that were admitted without objection and without any request or limiting instruction. And I think that's what the jury did was they took the testimony, they sorted it out the best they could, and came up with a verdict number that harmonized with the evidence they found persuasive. Let me ask you this. I'm looking at Exhibit 31. I take it that you introduced that? Yes, Your Honor, we did. What was the testimony, if any, about the $14,240-odd? All right, Your Honor. First of all, the point of that exercise was to show to the jury. Shane DeFazio was the witness, and it was to show the jury given these alternative understandings what are the direct consequences of it. The evidence that supports the $14,000 falls into three categories. First, Mr. Beshar testified that he developed this policy and he presented it to management and got tacit approval. He said that the bonus that he had agreed to with Mr. Davis was based on the policy. And then, secondly, third, he talked about how it worked. He said the baseline for measuring the performance was going to be actual revenue versus the baseline of budget, and then he would apply this sales commission policy that he had been in the middle of drafting. So that was point number one. Piece of evidence number two was the draft policy that clearly Mr. Beshar was drafting, and the jury had that information in front of them. That had two elements that I think are critical here. One is the policy makes clear reference, the draft policy makes reference to budgets as a baseline, but then it talked about the fact that the revenue that is at issue is revenue outside base contract scope. The scope of this contract was industrial cleaning at the BMW plant, and what Mr. DeFazio testified to, the meaning of that within the BMW contract means things other than industrial cleaning, maybe production support or maybe some other task that the BMW folks asked them to do. I understand what you're saying. So basically, if I understand it correctly, what you're saying is that there were one or more bonus calculations that the jury could agree upon. Correct, Your Honor. And they simply chose the one that was in Exhibit 31, which was $14,200-something. Well, that's right. Mr. Beshar, when he testified, did not have the policy in front of him. There are a lot of explanations for that, but that's the way it unfolded. So what we did was since Mr. Beshar testified that the bonus that he agreed to was consistent with a policy drafted, we showed the jury the policy that he was in the middle of drafting. All Mr. DeFazio did was take Mr. Beshar's testimony, take the policy, show the jury what was inside scope, outside scope, ran the revenue numbers, compared it to the budget numbers, and he came up with the calculations of $14,000. The jury clearly saw that because the figure that they rendered on the verdict is precisely 102% of the amount that Mr. DeFazio testified to. I'm happy to answer more questions about the evidence in this case, Your Honors, but I would point out that this was not an easy case for the jury to sort out, and it's remarkable that they did. And I think it really amply demonstrates why this is a case that clearly involves a bona fide dispute. If the jury categorically rejected the theory of the case of the plaintiff and came up with a number which is so well grounded in the evidence, clearly there was a bona fide dispute. They rejected my client's point of view. They rejected the plaintiff's point of view and came up with a verdict. And we can't lose sight of the fact that Judge Child sat through this testimony, listened to the arguments, listened to the evidence, and she too was able to make an evaluation of the evidence. But also, and I don't want to dwell on this too long, but we can't lose sight of the fact that the jury is charged with evaluating credibility. With all due respect to Mr. Davis, he had some credibility issues. One of his claims was he was asking, he filed requests for expense reimbursements representing that he made these expenses on behalf of the company, and the jury did not accept that claim. The second thing is Mr. Davis was terminated because he falsified vacation records, and the jury heard this evidence. So the jury has got to be thinking, well, maybe there's a contract, maybe not, but we have issues with what he's claiming. They clearly found that his theory of the case was not persuasive, and so we can assume that if you combine the facts in front of the jury and you combine a record of perhaps not fully persuasive credibility, it's certainly understandable how the jury ended up with its verdict. One of Mr. Davis' grounds for appeal is an argument that the trial court erred in denying the contra profferentum charge. To me, Your Honors, that charge would have been entirely inappropriate in this case. We've got a response to discovery that this is an oral contract. Again, unless counsel wants to stipulate that this is a written contract, the contra profferentum charge would be inappropriate. What if it's a hybrid contract where you've got part of it written, part of it oral? Well, I think Judge Childs is spot on. I mean, she cited to the authority that she had available to her to the effect that a hybrid contract is in essence deemed an oral contract, and she cited to CJS in the absence of any South Carolina authority, I think that's what we've got to go with. There was some vague reference to Mathis v. Brown as authority, but if we look back at that case at 698 Southeast 2nd at 777, the appellant in that case conceded that it was a written contract. The oral discussions that took place according to that case were rejected. That offer was not accepted by the employee in that case. So it would be our contention that anytime you've got a hybrid contract or an oral contract, the contra profferentum charge is entirely inappropriate because in South Carolina the law on oral contracts is that the terms have to be so clear, definite, certain, and precise that neither party can reasonably misunderstand them, and that's from the Alst v. Beard case. There was some talk about this draft policy. Apparently it was something that Bichard came up with to calculate the bonus and that that was used in calculating the $14,000. I assume Davis never agreed to that. How was it used? Mr. Bichard testified that the bonus that he agreed to was based on a policy that he was developing. The policy, and this is in his testimony, the policy that he was developing was based on an existing sales commission policy. I think all parties agree that the proposed policy that Bichard was talking about was never implemented. But Bichard testified that the agreement he reached with Mr. Davis was based on this policy that he was developing. And so the draft policy then became relevant as to what Mr. Bichard had on his mind. The agreement that he reached orally with him was based on a policy that had not been developed. Correct. So the oral agreement didn't have all of the terms in it. I guess you could argue that. Well, how else can you do it? I understand South Carolina law says, and you tell me because you're a South Carolina lawyer here and I'm with these South Carolina judges. But as I understand it, in an oral type agreement, it can't be ambiguous. Your Honor, I couldn't agree more. What is the purpose of this? I mean, how is this not ambiguous if it's an oral agreement to conform something to a policy that has not been developed? I couldn't agree. I'm from North Carolina. That sounds ambiguous to me. But tell me how that is not ambiguous. Well, it's not a question of ambiguity. How do you use it? I mean, I don't get it. I'm trying to understand. You've got this draft policy. Was that the basis for the $14,000 draft policy? It was that in combination with testimony by Mr. Bichard that that's what he had on his mind when he formed this contract. But not Mr. Davis because he didn't know about this because it wasn't developed. Then that very well could be. Well, tell me how else. I mean, was there any evidence? I mean, I understand you conditionally saying these things, but I don't know about the could be. I understand, Your Honor. He didn't know. He couldn't know. He said he hadn't developed it. You're right, Your Honor, and that's exactly our point. There was no meeting of the minds. And that's why we submitted this basket of evidence regarding that particular scenario. Keep in mind, and I think we've already. Tell me about the basket. You mean including that draft policy? Yes, Your Honor. How do you get that in? For what purpose? Is it parole evidence or is it something to explain this thing? You're not supposed to have an oral contract called ambiguity? What is it? Your Honor, in Mr. Bichard's testimony, he testified extensively about this policy that he drafted. He clearly had something on his mind when he was testifying. Now, he testified about three or four years after the facts, and so it was our view that we've got Mr. Bichard back in 2005. We've got Mr. Bichard when he testifies. Let's go back and see if we can grab the Mr. Bichard back in time. And the policy that he's drafting was almost like Mr. Bichard speaking from the grave. This was the real Mr. Bichard. This is what he had on his mind. If you go back and look at his testimony, he testifies extensively about this policy. I guess the bottom line is your argument is, from your perspective, the jury gave Mr. Davis something they shouldn't have given him at all. They should have given him a goose egg because you couldn't use that evidence outside to calculate the damages, but they did, and is that where you're going with this? Because I'm still having some difficulty. If you're defending this $14,000, I don't know where it's going. Your Honor, I'm defending it because we— It was unobjected to. It came in, and you let it—you put it in. Your Honor, we're defending—again, I said it's a peculiar situation. I'm defending a plaintiff's verdict. By peculiar, you mean confusing. Well, peculiar in that I'm a defense lawyer, and quite frankly, I still don't think there was a meeting of the minds. If he'll stipulate today it was a written agreement, then you could remand this case with instruction to enter a verdict on behalf of my client, but I do want to— It makes it simple for me. If your basic argument is that they really were entitled to no damages, but the jury gave $14,000 under maybe a mis— evidence that probably should not have been used for that purpose, which was a draft policy used to explain the oral agreement that's not supposed to be ambiguous. Your Honor, I don't think I would concede that. What I would—with respect, I would say that the jury took evidence in front of it that was not false, that was perfectly valid. We told the jury that there were various understandings, and one of the understandings is Mr. Bichard's testimony regarding how he came up with this, and it was based on the policy that he drafted. We found the policy that he drafted. It was beyond dispute. This is what he was working on, and all we did was run the numbers based on what the policy indicated. I know they didn't—I think they didn't object to the calculation by DeFazio. Was there an objection to the document, the draft policy? No, Your Honor. All of these were submitted as joint exhibits. I say I'm out of town. I haven't had an opportunity to address the affirmative defense issue. I'm happy to answer any other questions. Thank you. Mr. Arnold? The draft policy. How could there be a meeting of the minds in regards to a policy that did not exist at the time the parties contracted? The project booking bonus that was entered into evidence was dated November 2005. That's the calculation was based on a policy that is dated November 2005. The agreement between the parties is July 26, 2005. The policy didn't exist when they entered into their agreement. Did you object to the draft policy being introduced into evidence? No, because I didn't have any objection to it. Of course, I didn't understand that the jury was going to get confused because I thought the point was being made clearly, that we're not talking about a policy. We wanted to make clear to the jury. The way I look at it now, is it evidence that should have been admitted? Should I try to keep it out? Probably. As I understand it, it was put in because there was this oral agreement, which under South Carolina law cannot be ambiguous, but you get the draft policy because oral agreement is based on a draft policy not developed, and now it's developed. It was put in evidence, and you didn't say anything. Because I didn't want, and I thought we were clear on this, and obviously I was wrong, we wanted the jury to understand we were not talking about the policy. The policy was something completely different, and we wanted to show them that the policy was in fact dated three months after the fact. If I had known that the jury was going to say that there was a meeting. If you had objected and the policy didn't come in, you don't have to explain the policy. Right, and again. I don't get that. I don't understand what your strategy is here. Not that I'm trying to strategize with you. My point was I didn't understand, didn't think that a jury would think that a policy issued after the fact would be the basis for an agreement reached three months earlier. The policy wasn't written when we entered the agreement. How could my client have had. . . You let them decide it. I'm not trying to be. . . I really haven't had time. You let them decide it because you let that policy come in. I wanted it in, I thought. I thought I wanted them to know that that policy had nothing to do with what we were talking about because it came after the fact. I had no idea that the jury would say, well, we're going to say that even though it was three months after the fact, that's what they meant in July. I just had no idea. Was I wrong? Apparently. But that doesn't change the fact that the evidence doesn't support the verdict. Let me ask you this. Yes, sir. As I understand this record, Mr. Davis's claim for a bonus in excess of $100,000 clashes with the testimony of every other witness. No. Not true. Paul Bouchard testified. This is the question. So with the authority, you would have promised Tom Davis that he would receive a new work bonus of 1% for any increase of the baseline contract after July 2005. Yes. Now you said, if I understood that correctly, that he would have. Read the first part of what he said. Yeah, he said he would have. He would have. Yes, and he says he did. Is that different from what he agreed to? I mean, I don't understand what you're saying. He would have agreed. Well, I said with that authority. So with that authority, you would have. And he said, yes, that was my intent. Bouchard testified that my client was entitled to the bonus, that he went to the corporate and said, we need to pay him his bonus. Now, he didn't have the numbers in front of him, so we didn't do the calculations with Bouchard. So the basic point on the policy is, again, whether I made a mistake or not, there is no way to connect a meeting of the minds on July 26th with a policy issued, a draft policy never implemented, and my client never saw it that wasn't written until November. I thought DeFazio got that calculation of $45,000 from Bouchard. $45,000 from Bouchard. But he didn't get $110,000 because I don't think Bouchard said anything about $110,000, $110,000, $111,000. Well, look, that was their characterization of what Paul Bouchard said. So, look, could the jury bring it? I'm dealing with DeFazio because he's the one who's actually doing these calculations. Right, right. And, again, I'm wondering when that calculation is put to the jury, that's your damage information that's going up, and you're not clarifying this with the jury. Well, look, if the jury would have came back with $45,000, perhaps we've got a different ballgame because that was based on Bouchard's, they argued, based on Bouchard's testimony. But that's not what the jury got. They based it on this policy. Now, I want to come back to this idea, this idea that there's an oral contract. There is certainly evidence in this record that the jury could have concluded that there was a written contract. It was. The July 26 offer letter. So it is your statement, and the other side asked, do you want to say that the July 26 offer letter is your written contract? I think it is the written contract. There is no other written contract. There's no other written contract. And you're willing to say those terms are definite and certain in that letter? With parole evidence to provide the 1%. The idea that you can't use parole evidence to supply something that's unclear. The new work bonus was a reference to a 1% bonus. That was a multiplier. That was shorthand. Now, I think this is also critical, and I haven't had a chance to make it. This is a wage payment case. South Carolina Code section 41-1030 requires. Let me ask one last one. If this is a written contract and the parole evidence that comes in, is that draft letter then admissible as parole evidence, that draft proposal? But it was after the fact. But it goes to the point of at least what was understood to be the damages or what the bonus would constitute. No, because it contradicts. If it's from management's perspective. It contradicts the letter. The letter says it was for an increase of the contract. They say it was for increase of the budget, which they contend is different. So to the degree that the parole evidence explains the letter, yes, it would be admissible for that point. To the degree that it contradicts the letter, it's not admissible at that point. But this is probably the last point I have time to make. The law requires that this be put in writing. They're saying, well, this wasn't in writing. What was in writing could not have possibly been understood. Well, the South Carolina wage payment statute requires that you put the terms and conditions and wages agreed upon in writing. So if you didn't put it in writing so anybody could understand it, that itself is a violation of the wage payment statute and itself reason to construe the writing against the drafter. And I don't think you can. I'm done. Out of time. Thank you very much. I will come down and greet counsel, and then we'll take about a five or ten minute break.
judges: William B. Traxler, Jr., James A. Wynn, Jr., Clyde H. Hamilton